[Cite as *Best Fin. Solutions, L.L.C. v. Tifton Custom Parking, L.L.C.*, 2024-Ohio-4458.]

# IN THE COURT OF APPEALS
# FIRST APPELLATE DISTRICT OF OHIO
# HAMILTON COUNTY, OHIO

| | | |
|---|---|---|
| BEST FINANCIAL SOLUTIONS, LLC, | : | APPEAL NO. C-230518 |
| | | TRIAL NO. A-1805391 |
| Plaintiff-Appellee, | : | |
| vs. | : | |
| | | *O P I N I O N.* |
| TIFTON CUSTOM PACKING, LLC, et al., | : | |
| | : | |
| Defendants, | : | |
| and | : | |
| JASON BROWN, | : | |
| Defendant-Appellant. | : | |
| | : | |

Civil Appeal From: Hamilton County Court of Common Pleas

Judgment Appealed From Is: Affirmed

Date of Judgment Entry on Appeal: September 11, 2024

*Dinsmore & Shohl, LLP*, and *Brian S. Sullivan*, for Plaintiff-Appellee,

*Jason Brown*, pro se.

**BOCK, Presiding Judge.**

{¶1} Plaintiff-appellee Best Financial Solutions, LLC, ("Best Financial") brought this civil fraud case against defendant-appellant Jason Brown and defendants Trampis Dowdle, Tifton Custom Packing, LLC, ("Tifton"), Southern Exposure Farms ("Southern Exposure"), and Chardel Cattle Ranch, LLC, ("Chardel") (collectively, all defendant LLCs are "defendant LLCs"). Best Financial alleged that Brown and Dowdle fraudulently induced it to enter into agreements with Tifton and Southern Exposure (collectively, "the Entities"). Brown appeals from the trial court's judgment, asserting that the judgment was against the weight of the evidence.

{¶2} Though Brown asserted that he had good intentions and blamed bad weather for the Entities' failures and their inability to repay Best Financial, the jury, weighing the credibility of the witnesses, was permitted to disbelieve his testimony and find that Brown knowingly misrepresented facts to induce Best Financial to invest in the Entities. We hold that the jury's verdict was not against the weight of the evidence, and we affirm the trial court's judgment.

## I. FACTS AND PROCEDURE

### A. Facts

#### i. Best Financial invests in the Entities

{¶3} In 2016, Brown and Dowdle (a Florida-based farmer) formed Southern Exposure, an Ohio LLC, to grow produce in Florida, and Tifton, a Georgia LLC, to purchase produce from farmers and sell it to Overland Express, a Cincinnati trucking logistics company owned by Brown.

{¶4} Due to high upfront costs involved in growing, packing, and shipping produce, the Entities needed cash to operate. And because the Entities were newly-

formed businesses, neither could obtain conventional financing from a bank. Brown encouraged Mathew Best, an Overland Express employee, to invest in the Entities. Brown told Best that he could "turn millions in a couple months" and represented that he believed the Entities would be successful.

{¶5} Best convinced his father to invest in Brown's companies. In 2016, Best's father and Brown entered into a "factoring agreement" under which Best's father purchased some of Tifton's outstanding invoices at a discounted rate. In return, Best's father was entitled to the full value of each invoice once it was paid. Best's father received the full payment under the agreement as promised.

{¶6} Brown encouraged Best to convince other people to invest. Brown assured Best that the invoices were likely to be paid and were relatively safe investments. Brown advised Best to form an LLC to handle the investments. Best and his wife formed Best Financial.

{¶7} Best Financial obtained money from Best's friends and family to purchase invoices from the Entities via factoring agreements. Best Financial invested in the Entities from September 2016 through November 2017. At trial, Best Financial submitted into evidence four factoring agreements between it and either Tifton or Southern Exposure. Brown had signed each agreement as a representative of one of the Entities. Best Financial's investment statement documented every payment made to the Entities. Best Financial made each payment under a factoring agreement. Brown testified that he had expected to repay Best Financial when he entered into the agreements on behalf of the Entities.

{¶8} The initial factoring agreements between Best Financial and the Entities identified the specific invoices Best Financial was purchasing. Best testified that as

time went on, Brown suggested that rather than have Best Financial purchase specific invoices, Best Financial should purchase a dollar amount of the Entities' total invoices. Best Financial agreed. Accordingly, although a factoring agreement might state that Best Financial was purchasing specific invoices, this was not always the case.

{¶9}    Because Best worked with Brown at Overland Express, he would informally ask Brown about the Entities, and Brown assured him the Entities were doing well. Best believed the investments were secure. In total, the Entities owed Best Financial $418,164.48 in principal and interest.

### ii.    The Entities failed to pay Best Financial in full

{¶10}   In October 2017, some of Best Financial's investors wanted to withdraw money. Best Financial gave Brown notice that it was going to "pull out" $29,000 in October and another $129,000 in December 2017. Tifton repaid the $29,000 in early November 2017.

{¶11}   After that repayment, Best and Brown discussed another loan from Best Financial to the Entities. But Best Financial was concerned because the Entities were not repaying Best Financial as expected. To reassure Best Financial, the Entities agreed to provide Best Financial collateral to secure the loans ("the collateral"). The collateral consisted of $729,800 in assets, including Georgia real property purportedly owned by Tifton, slaughter class cattle, watermelon acreage, and bailed hay. But Tifton did not own the Georgia property—instead, Brown and Dowdle owned it individually. And the slaughter class cattle were owned by Dowdle or his family personally.

{¶12}   In November 2017, Best Financial gave the Entities an additional $35,000 under factoring agreements, secured by the collateral.

**{¶13}** Tifton did not make the $129,000 payment in December 2017. After Tifton missed the payment, Best frequently texted Brown to ask when the payment would be made. Brown consistently replied that he expected to generate enough money in an upcoming harvest to repay the debt owed to Best Financial. The Entities' last payment to Best Financial was $45,000 in February 2018.

**{¶14}** In January 2018, Southern Exposure's accounts receivable report showed that it had $249,239 in current outstanding invoices. The Entities collected some of these receivables. That same month, Brown applied for financing with John Deere for farming equipment. In the application, Brown listed his total assets at $1.7 million, liabilities at $700,000, and gross annual sales at $10 million. Brown testified that most of the assets listed were "business interest" and other noncash assets. Another lender loaned Southern Exposure $58,000 in January 2018. Southern Exposure granted this lender the right to withdraw daily payments of $454.21 directly from Southern Exposure's checking account.

**{¶15}** In March 2018, Brown told Best that the Entities would repay Best Financial "over the next 90 days as we harvest our crops." In June 2018, Best Financial sent a demand letter to Dowdle and Brown for full repayment by July 2018.

**{¶16}** The Entities ultimately failed. Brown testified that Southern Exposure's produce in Florida failed due to poor weather conditions. Additionally, a large partner of Southern Exposure unexpectedly backed out of a contract to purchase produce, leaving Southern Exposure unable to make payroll, which resulted in harvest workers leaving. Best Financial was unable to collect any of the collateral because of senior liens and because the cattle had "disappeared."

### B. Procedural history and damages

{¶17}  In October 2018, Best Financial sued Brown, Dowdle, Tifton, Southern Exposure, and Chardel, asserting claims against Brown and Dowdle for conversion, fraud, promissory estoppel, and civil conspiracy. Best Financial sought to pierce the corporate veil and hold Brown and Dowdle personally liable for the Entities' debts.

{¶18} The trial court entered a $435,049.02 default judgment against defendant LLCs. The judgment included $418,164.48 in compensatory damages and $16,884.54 in attorney fees.

{¶19}  The trial court held a jury trial on Best Financial's claims against Brown and Dowdle. The jury instructions explained that if the jury found Brown and Dowdle personally liable for defendant LLCs' acts and debts, the jury was to impose liability on Brown and Dowdle "for any damages that [defendant LLCs] caused" Best Financial. The trial court told the jury that it had already determined that defendant LLCs caused Best Financial $435,049.02 in damages, which included principal, interest, and attorneys' fees, and that this damage award was a fact not in dispute.

{¶20}  The jury found Brown liable on Best Financial's claims for promissory estoppel, fraud, and personal liability. It found both Brown and Dowdle personally liable for defendant LLC's acts and debt and determined that each were 50 percent responsible for the damages caused by defendant LLCs. But rather than awarding Best Financial $435,049.02 as instructed by the trial court, the jury awarded Best Financial $227,326.89 compensatory damages against Brown and $190,837.59 compensatory damages against Dowdle, as well as $50,000 against each for punitive damages. Further, the jury failed to follow instructions stated in the jury interrogatory forms. In

total, the jury awarded Best Financial $418,164.48, which equals the amount awarded by the trial court's default judgment against defendant LLCs, minus attorney fees.

{¶21} After the jury returned its verdict, the trial court identified the inconsistencies between the jury instructions and interrogatories and the verdict forms. Best Financial argued that because the jury pierced the corporate veil, it should have awarded it the full amount of the default judgment against both Brown and Dowdle, jointly and severally. But the trial court refused to change the verdict to match the default judgment. After a discussion, the trial court dismissed the jury and entered a nonfinal entry against Brown and Dowdle, jointly and severally, for $205,039.30, which matched the amount the jury entered on an interrogatory stating the total amount of liability incurred due to Brown's and Dowdle's personal liability for defendant LLCs' acts. The trial court also entered the jury's award of $50,000 in punitive damages against both men individually.

{¶22} Best Financial later moved to amend the judgment entry to award it $418,164.48 against Brown and Dowdle, jointly and severally, to reflect the jury's finding that both were personally liable for the defendant LLCs' acts. But before the trial court could hear arguments on the motion, Dowdle appealed ("the first appeal"). Brown later joined in the first appeal.

{¶23} While the first appeal was pending, the trial court heard arguments on Best Financial's motion to amend the judgment. The trial court stated that the "jury did not understand and follow the jury instructions and interrogatories" because although the jury had pierced the corporate veil, it awarded less than the total amount of damages awarded to Best Financial in the judgment against defendant LLCs. The court stated, "Unfortunately, these verdicts are against the weight of the evidence."

7

The trial court discussed Civ.R. 49(B) and stated that even though it thought it could correct the judgments to $205,000, "even a judgment for the $205,000 and the jury's verdicts were not supported by the evidence. The jury instructions were clear, if the corporate veil was pierced, plaintiff's damages were $418,464.48."

{¶24} The trial court construed Best Financial's motion as a motion for judgment notwithstanding the verdict ("JNOV") under Civ.R. 50(B)(1) and found that Civ.R. 50(B)(3) prevented it from rendering a judgment because the verdict was against the weight of the evidence. The trial court sua sponte ordered a new trial. Best Financial appealed the trial court's new-trial order ("the second appeal"). Brown and Dowdle later voluntarily dismissed the first appeal.

{¶25} In the second appeal, this court ruled that the trial court's new-trial order was void because the trial court lacked jurisdiction to order a new trial during the pendency of the first appeal. We remanded the case for further proceedings. *See Best Fin. Solutions, LLC v. Tifton Packaging, LP*, 2021-Ohio-2906 (1st Dist.) ("*Best Financial I*").

{¶26} On remand, Brown filed a JNOV motion. With a new judge presiding over the case, the trial court heard arguments on Brown's motion as well as Best Financial's renewed motion to amend the judgment. The trial court denied both motions and entered final judgment for Best Financial against Brown and Dowdle jointly and severally for $205,039.30, $50,000 in punitive damages against Brown and Dowdle individually, and attorney fees in accordance with the trial court's initial nonfinal entry.

{¶27} Brown appeals the trial court's judgment.

## II. LAW AND ANALYSIS

{¶28} In his sole assignment of error, Brown argues, "The trial court erred when it entered final judgment against [him] on August 29, 2023, after a new trial was ordered." His issue for review states, "the trial court erred when it entered final judgment against [him] . . . which was in direct conflict with the original final judgment entered on February 26, 2020[,] when it was determined the verdicts were against the weight of the evidence and a new trial was ordered."

{¶29} In arguing that the jury verdicts were against the weight of the evidence, Brown cites several civil rules, including Civ.R. 59(A). Best Financial notes that Brown never moved for a new trial under Civ.R. 59. Instead, he filed a JNOV motion under Civ.R. 50. Best Financial accordingly suggests that Brown cannot attack the verdict on manifest-weight grounds. But a new-trial motion is not a prerequisite to challenge a civil verdict based on the weight of the evidence. *See* R.C. 2321.01; *see also Eastley v. Volkman*, 2012-Ohio-2179, ¶ 29 ("Nothing in the rules or statutes requires a party to have made a particular motion before seeking appellate review of a jury verdict on the weight of the evidence."). We therefore interpret Brown's arguments as raising a manifest-weight challenge.

### A. Standard of review: manifest weight

{¶30} To review whether the trial court's judgment was contrary to the manifest weight of the evidence, we weigh the evidence and reasonable inferences, consider witness credibility, and determine if the factfinder lost its way and created such an obvious miscarriage of justice that we must reverse the judgment and order a new trial. Under this standard, reasonable presumptions should be made in favor of the judgment. *Eastley* at ¶ 21; *Chapel v. Wheeler Growth Co.*, 2023-Ohio-3988, ¶ 11

(1st Dist.). When evidence is susceptible to multiple constructions, we must interpret it as being consistent with the jury's verdict and trial court's judgment. *Mitchell v. Michael J. Auto Sales*, 2022-Ohio-2591, ¶ 14 (1st Dist.).

**{¶31}** This court should not reverse the trial court's judgment unless it is a rare, "exceptional case[]" in which "the factfinder disregarded or overlooked compelling evidence." *State v. Kendrick*, 2023-Ohio-1763, ¶ 16 (1st Dist.). For a court of appeals to reverse a jury's verdict on manifest-weight grounds, it must rule unanimously. Ohio Const., art. IV, § 3(B)(3).

## B. The void judgment

**{¶32}** Brown's primary argument on appeal is that, because the judge presiding over the trial stated that the jury's damage award and verdict were against the weight of the evidence, the new trial court should have deferred to that finding and ordered a new trial. While Brown acknowledges that the trial court's entry granting a new trial is void, he argues that the trial court should not have ignored the substance of the trial court's finding. We are not persuaded by this argument.

**{¶33}** First, as Brown acknowledges, this court held in *Best Financial I* that the new-trial order was void. When a judgment is declared void, courts should proceed as though the void judgment never occurred because it is a nullity. *Citizens Against Blasting On Our Miami (CABOOM) v. Anderson Twp. Bd. of Zoning Appeals*, 2012-Ohio-6145, ¶ 30 (1st Dist.). The parties are left in the same position as if the court had never entered that judgment. *Id.* Therefore, the trial court was not bound by the void order, and it had no obligation, as Brown suggests, to provide "any reason why [it] disagrees" with the void new-trial order.

**{¶34}** Second, the judge that ordered the new trial did not determine that the jury's finding of liability against Brown was contrary to the weight of evidence. Instead, the judge stated that the jury's damages award was against the weight of evidence—because the award was too low. Thus, that error prejudiced Best Financial, not Brown. *See* Civ.R. 61.

**{¶35}** Additionally, if the void new-trial order had remained in effect, this court's review of that order would have been for an abuse of discretion. *See Rohde v. Farmer*, 23 Ohio St.2d 82, 90 (1970). And "if the verdict is supported by substantial competent, credible evidence, a trial court abuses its discretion in granting a new trial based upon the weight of the evidence." *Jeffrey Allen Industries, LLC v. Manco*, 2014-Ohio-268, ¶ 29 (5th Dist.). To establish that the jury's liability verdict was against the weight of the evidence, Brown must point this court to *evidence* in the record demonstrating that he is entitled to relief. The judge's statement regarding the irregularity of the damages award is not evidence involving Brown's liability.

**{¶36}** Finally, Brown argues that the trial court erred under Civ.R. 49(B) in modifying the judgment rather than ordering a new trial. But Brown waived this argument because he acquiesced to the trial court's plan to modify the judgment. When the trial court identified the issue with the damages award and declared its intent to modify the verdict, Brown stated, "I agree with that." Later, Brown said, "I think the Court could just make the correction." Brown therefore waived any argument that the trial court should have ordered a new trial instead of modifying the judgment.

### C. Liability determinations

**{¶37}** While Brown's arguments on appeal primarily focus on the new-trial order, he argues that the jury's fraud verdict was against the manifest weight of the evidence, noting that Best stated that he did not believe that Brown's companies were created to fraudulently induce Best's investments. Though the language of Brown's assignment of error is limited to the new-trial order, Best Financial responded to Brown's arguments and defended the liability determinations. Accordingly, we turn to the merits of the fraud verdict and the veil-piercing remedy.[1] *See Marreez v. Jim Collins Auto Body, Inc.*, 2021-Ohio-4075, ¶ 4 (1st Dist.) ("In the interest of justice, we will consider all cognizable contentions presented but will not create an argument if a pro se litigant fails to develop one.").

**{¶38}** As an initial matter, although Best Financial's complaint and the trial court treated piercing the corporate veil as a claim, this court has held that "piercing the corporate veil is not a claim, it is a remedy encompassed within a claim, whereby liability for a particular tort may be imposed upon a particular individual." *White v. Pitman*, 2020-Ohio-3957, ¶ 41 (1st Dist.), quoting *Meehan v. Mardis*, 2019-Ohio-4075, ¶ 8 (1st Dist.).

**{¶39}** Generally, a limited-liability company's members are not liable for the LLC's debts, obligations, or liabilities. R.C. 1706.26; *Ettayem v. Ramsey*, 2019-Ohio-675, ¶ 29 (10th Dist.) (decided under former R.C. 1705.48). But under some circumstances, courts may impose personal liability on an LLC's members for the LLC's debts or acts. *Denny v. Breawick, LLC*, 2019-Ohio-2066, ¶ 15 (3d Dist.).

---

[1] Brown does not challenge the jury's promissory-estoppel verdict on appeal.

12

**{¶40}** The Supreme Court of Ohio established three elements that must exist for a court to pierce the corporate veil and hold an LLC's member liable: (1) the LLC's member has complete control over the LLC such that the LLC's existence is not separate from the member; (2) the member exercised control over the LLC to commit fraud or an illegal act against the plaintiff; and (3) the control and bad acts proximately caused the plaintiff injury or unjust loss. *Dombroski v. WellPoint, Inc.*, 2008-Ohio-4827, ¶ 18.

**{¶41}** On appeal, Brown contests whether he committed fraud or another illegal act. To establish fraud, Best Financial had to prove that (1) Brown made a misrepresentation; (2) the misrepresentation was material to its transactions with the Entities; (3) Brown made the misrepresentation falsely, knowingly, or recklessly; (4) Brown intended to mislead Best Financial into justifiably relying on the misrepresentation; and (5) the misrepresentation injured Best Financial. *FAP Properties XL, LLC v. Griffin*, 2022-Ohio-3410, ¶ 16 (1st Dist.). Generally, a fraudulent misrepresentation must relate to a present or past fact. *Crase v. Shasta Beverages, Inc.*, 2012-Ohio-326, ¶ 42 (10th Dist.).

**{¶42}** Fraud cannot be based on a promise regarding future actions unless the promisor had no intention of performing the promise when the representation was made. *Id.* Courts may not infer fraudulent intent simply based on a party's failure to perform. *M.S. v. Toth*, 2017-Ohio-7791, ¶ 19 (9th Dist.), quoting *First Natl. Bank of Omaha v. iBeam Solutions, LLC*, 2016-Ohio-1182, ¶ 46 (10th Dist.). But nonperformance can show fraudulent intent when it is coupled with evidence from which one may infer a party's lack of intent to perform when the promise was made. *Id.* When one party to an agreement performs its promise and the other party does not

13

make any effort to perform, a factfinder may infer that the party did not ever intend to perform. *Id.*

{¶43} Upon an independent review of the record, we cannot say that the jury clearly lost its way in reaching its verdict. The jury heard testimony from Brown, Best, Dowdle, and several other witnesses. Much of Brown's testimony conflicted with Best's testimony. Brown testified at length that he always had intended to repay Best Financial and made every attempt to perform under the agreements. But when witnesses provide conflicting testimony, the trier of fact determines the witnesses' credibility and resolves evidentiary conflicts. *State v. Higgins*, 2022-Ohio-2754, ¶ 13 (1st Dist.). The jury, as the trier of fact, appears to have found Brown not credible. We defer on appeal to that finding. *Id.*

{¶44} Our deference to the jury's verdict is particularly informed by evidence that Brown represented that the Entities owned the collateral securing Best Financial's final $35,000 investment. Best testified that the collateral was critical to Best Financial's decision to continue entering into factoring agreements with the Entities. And a November 2017 factoring agreement states that the collateral secured all outstanding invoices. Brown knew, or should have known, that neither entity owned much of the collateral. Instead, he and/or Dowdle personally owned the collateral. Brown agreed that the Entities never owned any of the slaughter class cattle listed as collateral. Best further testified that some of the cattle did not exist at all. This evidence suggests that Brown knowingly misrepresented the value of the collateral to induce Best Financial to continue entering into factoring agreements, which proximately caused Best Financial's damages.

{¶45} It is true, as Brown notes, that Best testified that he did not believe Brown formed the entities for the purpose of defrauding Best. But Best's statement regarding his belief about Brown's purpose in forming the Entities did not require the jury to determine that Brown intended to carry through with his promises. And Best's testimony about his beliefs do not convince us that the jury's liability determination was against the weight of the evidence.

{¶46} Brown also notes that Best Financial referred to the money it provided under the factoring agreements as "investments." Brown does not explain why this is relevant. Regardless, Brown himself testified that all the money Best Financial provided to the Entities was through factoring agreements. Unless there was evidence that Best Financial provided the money as a gift with no promise of repayment, how the parties referred to the money is immaterial. If Brown took the money with no intention of repaying the debt, he committed civil fraud.

{¶47} We hold that the jury's liability determination was not against the weight of the evidence. We overrule Brown's assignment of error.

### III.   Conclusion

{¶48} For the foregoing reasons, we overrule Brown's sole assignment of error and affirm the trial court's judgment.

Judgment affirmed.

CROUSE and KINSLEY, JJ., concur.

Please note:

The court has recorded its entry on the date of the release of this opinion.